DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ROLLS-ROYCE, PLC,** a foreign profit corporation,
Appellant,

v.

**SPIRIT AIRLINES, INC.,** a Florida Corporation,
**ROLLS-ROYCE CORPORATION,** a foreign corporation,
**ROLLS-ROYCE NORTH AMERICA, INC.,** a foreign profit corporation,
**IAE INTERNATIONAL AERO ENGINES AG,** a foreign profit entity,
**PRATT & WHITNEY,** a division of
**UNITED TECHNOLOGIES CORPORATION,** a foreign profit corporation,
Appellees.

No. 4D17-1215

[February 28, 2018]

Appeal of non-final order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael L. Gates , Judge; L.T. Case No. CACE 16-012458.

Stephanie G. Kolman, J. Thompson Thornton, and Clayton W. Thornton of Clyde & Co US, LLP, Miami, for appellant.

Eric D. Griffin, Jr. and Juan R. Serrano of Griffin & Serrano, P.A., Fort Lauderdale, for appellee Spirit Airlines, Inc.

**ON MOTION FOR REHEARING, MOTION FOR REHEARING EN BANC AND REQUEST FOR WRITTEN OPINION**

KUNTZ, J.

Rolls-Royce, PLC moves for rehearing directed to our opinion affirming the circuit court's denial of its motion to dismiss for lack of personal jurisdiction. We agree that the court erred by denying its motion without holding an evidentiary hearing to resolve disputed issues of fact. As a result, we grant the motion for rehearing in part, withdraw our prior opinion, and substitute this opinion in its place. In our holding, we reverse the court's order denying the motion to dismiss and remand for further proceedings.

## *Background*

Around twenty minutes after Spirit Airlines Flight 165 departed Dallas/Fort Worth International Airport for Hartsfield-Jackson Atlanta International Airport, one of the Airbus A319's engines exploded. Using its other engine, the A319 safely returned to Dallas without injury to any passengers or crew.

Spirit filed a lawsuit in the Broward County Circuit Court relating to the explosion, naming Rolls-Royce Corporation, Rolls-Royce North America, Rolls-Royce, PLC,[1] IAE International Aero Engines AG, and Pratt & Whitney, a division of United Technologies Corporation, as defendants. In its complaint, Spirit asserted claims of negligence and gross negligence against the three Rolls-Royce entities, gross negligence against IAE, and gross negligence against Pratt & Whitney.

In 2012, Rolls-Royce performed major repairs and alterations on the engine at issue, including "removal, inspection and replacement of various components of the Engine's turbine as well as a restoration and refurbishment of the Engine's hot section." After the repairs, the engine was delivered to Spirit in Fort Lauderdale for "installation on the number one position—on the left side—of one of Spirit's Airbus A319, identified as Aircraft Registration No. N516NK."

Spirit also alleged that Rolls-Royce "took a $200 million share of the Spirit Airlines order of the V2500-model engine," stating that this shows Rolls-Royce "actually participated to the tune of $200 million dollars in the business component of Spirit's utilizing the V2500 model engine in its Florida operation."

Rolls-Royce moved to dismiss for lack of personal jurisdiction. Attached to the motion to dismiss was an affidavit of Will Morris, the Chief Counsel, Civil Aerospace, for Rolls-Royce. Within the affidavit, Mr. Morris stated that Rolls-Royce is organized under the laws of the United Kingdom, has its principal place of business in the United Kingdom, and maintains all of its corporate records in the United Kingdom.

Mr. Morris stated that Rolls-Royce did not design, manufacture, or sell the subject engine; Rolls-Royce is not a shareholder, member, or participant in IAE, nor a party to any contract between IAE and Spirit; and

---

[1] In its complaint, Spirit collectively refers to Rolls-Royce Corporation, Rolls-Royce North America, and Rolls-Royce, PLC, as "Rolls-Royce."

Rolls-Royce did no work on the subject engine or subject aircraft in Florida. Mr. Morris also stated that IAE and Rolls-Royce entered into an agreement, to which Spirit was not a party, under which Rolls-Royce would conduct V2500 engine repairs at Rolls-Royce's engine repair facility in East Kilbride, United Kingdom.

Under Rolls-Royce's contract with IAE, IAE had Spirit deliver the subject engine to Rolls-Royce's "East Kilbride repair facility for a scheduled restoration shop visit." Mr. Morris stated that any funds Rolls-Royce received for work done on the subject engine were from IAE and not Spirit. As for Spirit's allegation that Rolls-Royce "took a $200 million share of Spirit Airlines order of the V2500-model engine," Mr. Morris stated that the allegation is based on an ownership interest in IAE that Rolls-Royce sold—and sold before any of the events alleged in Spirit's complaint.

Spirit responded to Rolls-Royce's motion to dismiss, attaching various documents. Spirit separately filed an affidavit of Jim Baumiller, Spirit's Director of Engineering and Technical Support. Mr. Baumiller stated that when Spirit evaluated the V2500 engine for use and began operating the V2500 engine, Rolls-Royce held around a one-third interest in IAE. He stated that "[a]s far as Spirit is concerned, at all times during my tenure, [Rolls-Royce] repaired, maintained and overhauled the majority of V2500 engines operated by Spirit in its Florida-based operation."

Mr. Baumiller asserted that "this Engine was serviced, inspected and critical components overhauled by" Rolls-Royce, and that "after service, inspection and overhaul, [Rolls-Royce] delivered the Engine directly from the UK to Spirit in Florida." He also stated that "along with the Engine, [Rolls-Royce] delivered the written records and certifications of the servicing, inspections and overhauls performed by [Rolls-Royce]. The records were delivered directly to Spirit in Florida." Finally, Mr. Baumiller provided information relating to four other engines repaired by Rolls-Royce, and ultimately delivered to Spirit.

In reply, Rolls-Royce filed an affidavit of Alan Kelly, the Customer Business Manager for Rolls-Royce V2500, BR710, and TAY engines. Mr. Kelly stated that he is personally familiar with Rolls-Royce's contract with IAE and with Rolls-Royce's "role in providing service to certain components" of Spirit's V2500 series engines. Rolls-Royce sold its interest in IAE in mid-2012, however, continued to provide service to IAE under an agreement he states is "customarily referred to as the Common Maintenance Center Agreement or 'CMC Agreement.'" Pursuant to that CMC Agreement, Rolls-Royce performed work on engines for IAE,

including engines owned by airlines with which IAE had "Fleet Hour Agreements."

A Fleet Hour Agreement, he explained, works in concert with the CMC Agreement. Under the Fleet Hour Agreement, IAE's customers notify IAE when an engine requires service, and Rolls-Royce has "no involvement whatsoever" in the process. IAE then directs its customer, the airline, to ship the engine to one of the facilities that IAE has a CMC Agreement with for service to the engine. Rolls-Royce operates one of those facilities, the facility in the United Kingdom.

Spirit and IAE, according to Mr. Kelly, entered into a Fleet Hour Agreement in April 2005, "pursuant to which IAE agreed to manage a select number of Spirit Airlines' V2500 engines." Under that agreement, IAE designated the specific engine to be shipped to Rolls-Royce for "planned/convenience purposes." Rolls-Royce was not involved in IAE selecting its facility to service this engine and "had no role in the transport or shipment of the engine to the United Kingdom." After Rolls-Royce completed the work on the subject engine, and after "it [was] fully reassembled, it [was] placed back on the engine stand which is the property of the airline, and covered in the airline engine bag." Rolls-Royce then notifies IAE that the engine is available for release.

Finally, Mr. Kelly stated that Rolls-Royce "does not pay for, coordinate, or arrange for the return shipment of engines delivered to it pursuant to IAE's arrangements as described above. Rather, pursuant to the CMC Agreement . . . IAE and/or its agent is directly responsible for coordinating the return of the engine to IAE's customer, who in this case was Spirit Airlines." He also disputed Mr. Baumiller's assertion that Rolls-Royce directly delivered the accompanying paperwork to Spirit in Florida. Instead, Mr. Kelly stated that Rolls Royce released the records to a representative of IAE "who took custody and possession of the engine and placed it on a lorry at the loading dock of [Rolls-Royce] in East Kilbride, Great Britain."

After the briefing was complete, the circuit court held a hearing. Spirit conceded that it was only requesting that the court exercise specific personal jurisdiction over Rolls-Royce. After the hearing, the court asked counsel to submit proposed orders on the motion and later rendered an order denying Rolls-Royce's motion to dismiss. Rolls-Royce timely appealed the court's order.

### Analysis

We review a court's order denying a motion to dismiss for lack of personal jurisdiction *de novo*. *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 447 (Fla. 4th DCA 2012).

Whether a Florida court has personal jurisdiction over a non-resident defendant involves a two-step inquiry. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). First, the court must determine whether the complaint alleges sufficient jurisdictional facts to bring the action within Florida's long-arm statute.[2] *Id.* If the plaintiff has met its burden in the first step, the court must determine whether sufficient "minimum contacts" are shown between the non-resident defendant and Florida to satisfy due process. *Id.*

Personal jurisdiction can be "specific" or "general." *Marina Dodge, Inc. v. Quinn*, 134 So. 3d 1103, 1106–07 (Fla. 4th DCA 2014). Specific personal jurisdiction exists when "the alleged activities or actions of the defendant are directly connected to the forum state." *Caiazzo v. Am. Royal Arts Corp.*, 73 So. 3d 245, 250 (Fla. 4th DCA 2011). On the other hand, general personal jurisdiction exists when "the defendant's connection with the forum state is so substantial that no specific or enumerated relationship between the alleged wrongful actions and the state is necessary." *Id.*

Spirit first alleged that Rolls-Royce "engages in substantial, systematic, and non-isolated business activities throughout the United States, including Florida." Yet it has since withdrawn its claim that Rolls-Royce is subject to the general personal jurisdiction of the Florida courts. This allegation therefore is insufficient to satisfy the first inquiry.

Limited then to specific personal jurisdiction, Spirit must rely on its assertion that Rolls-Royce committed a tort in Florida. Under section 48.193(1)(b), Florida Statutes (2013), the Florida courts have personal jurisdiction over a non-resident defendant if that defendant committed a tortious act within the state. Generally, Spirit asserts that Rolls-Royce did so by delivering "the sinister engine to Florida for installation on the subject aircraft in Florida." Spirit argues that the jurisdictional discovery in the record "establishes that such return to service was accomplished via [Rolls-Royce's] Maintenance Release and other records which were prepared by [Rolls-Royce], packaged with the subject engine and sent by [Rolls-Royce] directly to Spirit in Florida where they were received and relied upon by Spirit's technicians in reinstalling the engine."

---

[2] *See* § 48.193, Fla. Stat. (2013).

5

In Rolls-Royce's first responsive pleading, however, it filed the motion to dismiss and accompanying affidavits discussed above in detail. Based on the complaint and affidavits filed by the parties, it appears to be undisputed that there are no contractual agreements between Rolls-Royce and Spirit, and that Spirit made no payments directly to Rolls-Royce. It is also undisputed that the accident in question occurred in the sky, shortly after takeoff, from Dallas/Fort Worth International Airport.

Courts have found similar facts insufficient to exercise specific personal jurisdiction in Florida. In *Hinkle v. Continental Motors, Inc.*, 268 F. Supp. 3d 1312 (M.D. Fla. 2017), the court was presented with a case involving "an aircraft purchased from a Minnesota corporation, sold by a Virginia salesperson, delivered in Minnesota, which crashed in South Carolina." *Id.* at 1317. The plaintiff alleged that "the post-accident testing showed the oil transducer was faulty and the engine did not produce the required power to function properly" and "generally that Kavlico manufactured a defective sensor in the Aircraft which contributed to the loss of engine power; [ ] and Cirrus manufactured a defective Aircraft and misrepresented its airworthiness." *Id.* at 1318.

The court drew on analysis from *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017), a recent opinion from the Supreme Court, which "reiterated the importance of the 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State' in the context of specific jurisdiction." *Hinkle*, 268 F. Supp. 3d at 1322 (quoting *Bristol–Myers Squibb*, 137 S. Ct. at 1780). Because the plaintiffs in *Bristol-Myers Squibb* did not allege "that they obtained the product from an in-forum source, or were injured or treated in the forum state. . . . "[T[he Supreme Court held that the California courts lacked specific personal jurisdiction over the defendant." *Id.*

Returning to the issue before it, the court found that "it is undisputed that the alleged tort caused injury in South Carolina, the site of the crash, not Florida. And the Aircraft was sold from and delivered in Minnesota. And any alleged tortious act, based on the allegations in the Complaint and Amended Complaint, occurred outside of Florida." *Id.* at 1324.

The plaintiffs in *Hinkle,* as here, relied on *Wendt v. Horowitz*, 822 So. 2d 1252 (Fla. 2002), to support their argument that our long-arm statute is satisfied by the commission of a tort out of state that causes injury to a Florida resident. *Id.* at 1324. The court rejected this. *Id.* We agree, because *Wendt* is premised on an actual connection between the tortious

6

act and Florida. *See id.* On the facts in *Hinkle,* which are similar to the facts in this case, that connection did not exist.[3]

We agree with *Hinkle* and, here, the alleged connection to Florida may be similarly tenuous. At a bare minimum, the two affidavits filed by Rolls-Royce create a disputed issue as to the allegations asserted by Spirit. And, in our state court system, those disputed issues *must* be resolved through an evidentiary hearing. *See, e.g., Packaging & Distribution Res., LLC v. Duke Realty Ltd.,* 194 So. 3d 509, 510 (Fla. 4th DCA 2016).[4] That is what must occur in this case to resolve the disputed factual issues, a dispute limited to whether the court may exercise specific personal jurisdiction over Rolls-Royce.

### Conclusion

Rolls-Royce filed two affidavits that created disputed issues of fact about whether the court could exercise specific personal jurisdiction over it. The court was required to conduct an evidentiary hearing to resolve the disputed issues. As a result, we reverse the court's order and remand for an evidentiary hearing to resolve the disputed issues. If the court concludes Rolls-Royce did not commit a tortious act within the state of Florida, the motion to dismiss must be granted.

*Reversed and Remanded.*

TAYLOR and LEVINE, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

---

[3] A similar result was reached in *Clay v. AIG Aerospace Ins. Services, Inc.*, 61 F. Supp. 3d 1255 (M.D. Fla. 2014).

[4] In the federal court system an evidentiary hearing to determine personal jurisdiction is not required but held at the discretion of the court. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006).